[Cite as *In re I.C., S.C.*, 2023-Ohio-4707.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN RE:                                            CASE NO. 5-23-15

    I.C.,

NEGLECTED AND
DEPENDENT CHILD.                                 **O P I N I O N**

[RACHEL C. - APPELLANT]
[JOHNATHON C. - APPELLANT]

---

IN RE:                                            CASE NO. 5-23-17

    S.C.,

NEGLECTED AND DEPENDENT CHILD.

[RACHEL C. - APPELLANT]                          **O P I N I O N**
[JOHNATHON C. - APPELLANT]

---

**Appeal from Hancock County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 2021 and 0004**

**Judgment Affirmed**

**Date of Decision:  December 26, 2023**

---

**APPEARANCES:**

    *Alison Boggs* **for Appellant Rachel C.**

    *Linda Gabriele* **for Appellant Johnathon C.**

    *Emil G. Gravelle* **for Appellee**

Case No. 5-23-15 and 5-23-17

**WALDICK, J.**

{¶1} Mother-appellant, Rachel C. ("Mother"), and father-appellant, Johnathan[1] C. ("Father"), bring appeal 5-23-15 from the June 2, 2023, judgment of the Hancock County Common Pleas Court, Juvenile Division, granting permanent custody of the minor child I.C. to the Hancock County Job and Family Services, Children's Protective Services Unit ("CPSU"). Mother and Father also bring appeal 5-23-17 from the June 13, 2023, judgment of the same court placing the minor child S.C. in the legal custody of Jessica and Jesse D. On appeal, Mother and Father argue that the trial court's determinations were not supported by the evidence, and that CPSU did not engage in reasonable efforts to support reunification in both instances. Mother also argues that the trial court erred by holding the permanent custody and legal custody hearings simultaneously.

*Background*

{¶2} Mother and Father are developmentally disabled and receive services from the Board of MRDD. Mother and Father had two children together, I.C., born in November of 2011, and S.C., born in September of 2013. I.C. is autistic and S.C. deals with seizures and has ADHD.

{¶3} CPSU first became involved with I.C. and S.C. in September of 2020 due to allegations of domestic violence in the home. It was reported that Father

---

[1] At times in the record "Johnathan" is spelled "Jonathan." We used the spelling contained in the judgment entries.

-2-

would smack Mother and pull her hair daily, including in front of the children. In addition, there were concerns with I.C. being significantly underweight.

**{¶4}** CPSU received another report on November 3, 2020, indicating that Father was smacking and/or spanking the children for "no reason." Just a few days later, CPSU received a report that Father had inappropriately touched his daughter, S.C.

**{¶5}** After the allegations, Father initially resisted leaving the home, but he ultimately left so that Mother could remain with the children. Around that time, Mother filed for, and received, a civil protection order against Father. However, shortly thereafter Mother denied all of the abuse allegations and asked that the protection order be dismissed. Nevertheless, Father admitted to committing domestic violence against Mother to CPSU, and Mother and Father agreed to voluntary services with CPSU in December of 2020.

**{¶6}** In May of 2021, Father was permitted back into the home. Shortly after Father returned to the home, new allegations were made of Father sexually abusing S.C., and of physical abuse and neglect of the children. Mother and Father accused S.C. of being a liar to CPSU while S.C. was present. After the incident, S.C. expressed thoughts of suicide. As a result of the new allegations, the children were sent to a relative's home on a safety plan.

**{¶7}** Unfortunately, while at the relative's home, the children lost a significant amount of weight. Specifically, I.C. lost 7 pounds, despite already having

weight issues, and S.C. lost 12 pounds. In addition, the children were not receiving their medication and Mother was discontinuing services with providers. CPSU spoke to the children's caregiver and she indicated she could not care for the children and that she was suicidal herself. At that time, CPSU filed to remove the children from Mother and Father.

**{¶8}** Complaints were filed alleging that the children were Neglected and Dependent pursuant to R.C. 2151.03 and R.C. 2151.04. By consent of the parties, the children were found to be Neglected and Dependent as alleged. For disposition, S.C. was placed in the temporary custody of a distant relative, Jessica D., while I.C. was placed in foster care in the temporary custody of CPSU. Notably, CPSU contacted a significant number of relatives attempting to keep the children together, but the agency was unable to find any relatives willing to take both children, particularly with I.C.'s special needs.

**{¶9}** Over the ensuing months, Mother and Father worked the case plan. As part of the case plan, Mother and Father were evaluated by a psychologist selected by CPSU and by a second psychologist that they selected. Both psychologists concluded that neither parent could be a good enough parent for either child together or alone due, in part, to low cognitive abilities.

**{¶10}** In August of 2022, Jessica and Jesse D. filed a motion for legal custody of S.C. In September of 2022, CPSU filed a motion for permanent custody of I.C. A hearing was held on both motions simultaneously on May 9-10, 2023.

{¶11} On June 2, 2023, the trial court filed a judgment entry granting CPSU's motion for permanent custody of I.C. On June 13, 2023, the trial court filed a judgment entry granting Jessica and Jesse D.'s motion for legal custody of S.C. Both parents appealed the trial court's judgment. Mother asserts the following assignments of error for our review:

### Mother's First Assignment of Error

**The trial court's decision is against the manifest weight of the evidence. Appellee did not prove by clear and convincing evidence that the court should grant its motion for permanent custody of I.C. or grant its motion for legal custody of S.C. to the D[.]'s.**

### Mother's Second Assignment of Error

**The Trial court erred to the prejudice of [Mother] when it conducted one hearing for both the permanent custody motion for I.C. and the legal custody motion for S.C.**

### Mother's Third Assignment of Error

**The trial court erred in finding the agency used reasonable efforts for reunification throughout the case, depriving [Mother] Chamberlain her constitutional right to raise her children.**

Father asserts the following assignments of error for our review:

### Father's First Assignment of Error

**The juvenile court's decision to grant permanent custody of I.C. to the agency and legal custody of S.C. to the temporary custodian is against the manifest weight of the evidence as the appellee did not prove by the applicable standards that the minor children should not be reunited with their parents.**

**Father's Second Assignment of Error**

**The juvenile court abused its discretion in finding that the permanent custody of I.C. to the agency and legal custody of S.C. to the temporary custodians was in the children's best interest.**

**Father's Third Assignment of Error**

**The juvenile court committed prejudicial error in finding that the agency made reasonable efforts and diligent case planning to accommodate the parents' alleged disabilities and reunite them with their children.**

{¶12} As there is significant overlap in Mother and Father's assignments of error, we will address them together where appropriate.

*Mother's First Assignment of Error*; *Father's First and Second Assignments of Error*

{¶13} In Mother's first assignment of error, she argues that the trial court's permanent and legal custody determinations regarding the children were not supported by the evidence. In Father's first and second assignments of error he also argues that the trial court's determinations were not supported by the evidence.

{¶14} As both the permanent custody hearing regarding I.C. and the legal custody hearing regarding S.C. were held together, we will discuss the evidence presented, then we will address the trial court's determination regarding permanent custody of I.C. Finally, we will proceed to address the determination regarding legal custody of S.C.

Evidence Presented

**{¶15}** In both judgment entries the trial court thoroughly summarized the evidence contained in the record and the evidence presented at the final hearing. Having reviewed the record in its entirety, we determine that the trial court's summary of the evidence is supported by competent credible evidence. Therefore, we quote the trial court's summation of the evidence at length.

> Dr. David Connell (hereinafter "Connell") is a licensed clinical and forensic psychologist. He performed a parenting evaluation of [Mother] and [Father] at the request of CPSU. His evaluation included testing on the parents and he testified as to his analysis and conclusions. Connell described [Mother] as a very nice young woman who has a history of maladjustment. He describes [Father] as a person who has exhibited behavior problems much of his adult lifetime and who has a significantly low IQ. In his opinion, their situation is made worse by the fact that [Mother]'s mother resides with them and she suffers from Schizophrenia. He called it a "bad situation all around". Connell stated that in his opinion neither parent could be a "good enough parent" for either child and that his opinion did not change if the parents separated. He stated that he has profound concerns about [Mother] being a good enough parent to her two children because of her personality, her inability to keep the children safe, and her continued relationship with the father who is violent. Connell stated that he has concerns about [Father] and his low IQ, his history of maladaptive violent behavior and his inability to maintain a healthy relationship with his wife over a number of years. He does not believe that the parents can change in the ways that they would need to change in order to be fundamentally good parents because they lack the capacity to do so. Connell indicated that the complicated needs of [I.C.] and [S.C.] increased his concerns about [Mother] and [Father]'s parenting.
>
> Jessica D[.] is the relative caregiver for S.C. * * * She described the significant issues she had with S.C. at the beginning of this case. She indicated that S.C. has progressed quite a bit. [Jessica] described a bond between S.C. and her family and also indicated that S.C. is very

-7-

bonded to [Mother]. In [Jessica]'s opinion, S.C. does not have much of a relationship with [Father]. S.C. takes medication daily and one medication is for a seizure disorder. This medication was prescribed after S.C. came into her care. [Jessica] observed behavior in S.C. that was found to be related to seizures. Prior to S.C. being placed [with Jessica and Jesse D[.], [Mother] had stopped taking S.C. to the physician. This lack of medical care was corrected when [Jessica] began to take S.C. regularly to the physician. Since being medicated, S.C.'s seizure issue is under control and now her ADHD is treated regularly by medication. [Jessica] indicated that she ensures S.C. and [I.C.] visit together and would continue to do so. [Jessica] also intends to allow [Mother] and [Father] to visit with S.C. in the future if S.C. remains in her home.

Dr. Mark A. Babula is a licensed clinical psychologist. Dr. Babula completed a second parental fitness evaluation of [Mother] and [Father] at the request of the [appellants]. Dr. Babula completed different testing than what Dr. Connell completed with the parents. During the evaluation, [Father] indicated that his medication did not make him less upset, it made him tired. [Father] reported that he does not believe the violence will happen again. He indicated that he has asked for changes in his medications but the changes just have the same effect, He was medication compliant during the evaluation, however he was not regularly using his CPAP machine. [Father] reported that he had learned better parenting skills with the help of Amy, the home-based therapist and expected that should would [sic] remain with them for a while. He was able to state that he no longer yelled or hit, he now uses time outs, finger-wagging and stoplights (a system put in place by Amy and being used by the parents). [Mother] reported to Dr. Babula that she and [Father] have learned not to mess up. They have learned more about parenting and have begun to work on their marriage more. In Dr. Babula's opinion neither [Mother] nor [Father] has the skills and fitness to have primary responsibility for these children. Like Dr. Connell, Dr. Babula's concerns are only magnified by the fact that the children have special needs. Dr. Babula recommends that neither parent have primary responsibility for caring for the children. He believes that medical, school and day-to-day decisions should be someone else's responsibility for the children.

Jesse D[.] testified and he echoed his wife's (Jessica D[.]) testimony in that he acknowledges a need for S.C. to have a continuing relationship with her parents and with [I.C.].

Tammy Alvarado (hereinafter "Alvarado") testified that she is the family's current caseworker. She relayed the initial concerns that CPSU had with the family including domestic violence in front of the children, [Father] spanking and smacking the children, [Mother] seeking a civil protection order and then recanting, [Father] hitting S.C., sexual abuse of S.C. by [Father] and the safety plan monitors no longer willing to assist the family with keeping the children. Alvarado stated that CPSU was able to find a relative (the D[.]'s) to care for S.C. but could not find a relative for [I.C.] so he was placed in foster care. [I.C.] has remained at this foster home the entire time the case has been open. Alvarado explained that the family was referred to Becky Shumaker for a search of family placement for [I.C.]. No one could be located. The original relative who requested the children's removal at the beginning of the case express[ed] that she again was interested but CPSU did not approve her for a subsequent placement due to the concerns of her care of the children and her inability to handle them. Alvarado indicated that the parents are compliant with her and have completed every service that CPSU requested of them, however concerns remain that the parents are unable to implement the skills they learned long term. This is why CPSU sought a psychological evaluation to determine if CPSU could provide anything else to assist the family.

Alvarado testified that her concerns include incidents that have happened during visitations between the children and their parents. In November 2022, while on a visit, [I.C.] was able to get out of [Mother] and [Father's] home. CPSU provided alarms for the doors and windows to the family but there was a delay in installing the alarms by [Father] and [Mother]. Alvarado also indicated that [Father] falls asleep during visits with the children causing concerns about what would happen if the children were placed full time back in the home. Alvarado testified that [Father] has sleep apnea and has been told by medical professionals to use his CPAP machine but does not use it regularly. More recently in April, 2023, [I.C.] scalded himself when he went to get a glass of water and turned the hot water on instead of the cold. Alvarado has seen [I.C.] regress when he is with the parents and believes this would continue if he were to be returned to their care.

Alvarado indicated that she has huge concerns about medication. [Father] has not followed the schedule for his own medications and has instead taken all of his medications at night which is not correct. Both children have significant diagnoses which require medication. Alvarado is concerned about the opinion of both doctors that indicated the parents lack the ability to parent. In addition, Alvarado states that [Father] is getting angrier lately. [Mother] has told Alvarado that [Mother] cannot parent alone because [Mother] struggles to parent the children when [Father] is not present and [Father] has recently started a second shift job. Alvarado testified that the parents have stated they do not understand the special needs of each child and their disabilities. Although the parents are compliant people who are very nice according to Alvarado, Alvarado does not believe the parents have the ability to care for the children full time. Because of the concerns, CPSU has not progressed to overnight visits between the children and parents.

Alvarado stated that [I.C.] has flourished in foster care and the foster parents are willing to adopt him. She stated that [I.C.] eats, has gained weight and is very bonded with his foster family as he goes to them for affection and comfort. Alvarado stated that CPSU has completed a home study on the D[.]'s home for S.C. and it was approved. She indicated that she would like S.C. to be placed in their legal custody. She believes that the D[.]s and [I.C.]'s foster parent have committed to ensure a relationship between the children. Although not binding, Alvarado believes that [I.C.]'s foster parents would continue contact between [I.C.], S.C. and [Mother] and [Father]. Alvarado believes this scenario is what is best for the children. Alvarado testified that in her opinion, [I.C.] is in need of a legally secure ·placement and that such a placement is not achievable without the granting of permanent custody.

Amy Ward (hereinafter "Ward") testified that she is the home-based therapist for the family. She has been providing the family with parent education in their own home since September 2021. Ward stated that she finds both [Father] and [Mother] very compliant and willing to learn. The parents have never cancelled a session with her. Ward has taught the family to cook meals, keep the home safe and to be honest and transparent with everyone. Ward acknowledged that the family delayed installing the door and window alarms. Ward has no concerns about [Mother]'s mother in the home. Ward indicated that [Father]

was compliant with her and followed [Mother]'s lead. Ward indicated if the CPSU case closes, her work with the family must end due to the way her program is funded. When asked about her concerns regarding [Father] and [Mother's] parenting, she stated that her main concern is what would happen to the children if something happened to Rachel as she believes Rachel is the main caretaker.

Stella Maxwell (hereinafter "Maxwell") testified that she is the foster mother of [I.C.]. She described [I.C.] when he arrived in her home as a child who would only use a bottle and could not say any words. He has progressed in her care. He now showers, can say words; uses a cup and has few issues with eating. He is still on medications and has not had any seizures. He is diagnosed with autism and ADHD. [I.C.] is reportedly bonded with everyone in the foster family. Maxwell indicated that [I.C.] enjoys seeing his parents but will sometimes need encouragement to go to them. She has seen some regression after a visit to include waking at night screaming, using grunts and pointing instead of words and throwing water on the floor. Maxwell is interested in adopting [I.C.] and also acknowledges [I.C.]'s need to have a relationship with his parents and sister. Ms. Maxwell hugged both parents on her way out of the courtroom.

Debra Barnhart (hereinafter "Barnhart") testified that she is employed with Blanchard Valley Center and she supports individuals with developmental disabilities. Barnhart Indicated that [I.C.] has limited services with her agency. Her role is mainly to contact the foster parent and check on I.C. Barnhart reported that I.C. has been doing well drinking out of a cup and communicating better. He is diagnosed with a food disorder. She described [I.C.] as doing well and he was relaxed the last time she saw him in his foster home. He appears bonded with the foster parent and he snuggled up to his foster mother on the visit. [I.C.] is not yet potty trained and has cognitive delays. Because [I.C.] is a minor and being cared for by a foster parent, Barnhart explained that her agency is involved in a limited capacity. If [I.C.] needed more supports in the future, he may be eligible for a waiver so that her agency could provide more services. Currently there is no need to expand services as all of his needs are met in the foster home.

Rebecca Shoemaker [sic] (hereinafter "Shumaker") testified that she is the Kinnect to Family caseworker and she conducted a search for a

family member to care for [I.C.] Although the case was successful for S.C., Shumaker was unsuccessful in finding a relative to care for [I.C.] as he was much more difficult to place.

Tim Sandford (hereinafter "Sandford") testified that he is the CASA/GAL for [I.C.] and S.C. He has visited with the children between 15 and 17 times. Sandford testified that he has reviewed the reports by the psychologists in this case and Sandford stated he feels that it takes a village to raise a child. He has raised a child with special needs himself and has experience that applies here. He believes that there are supports that can help the family and he has contacted an organization in Michigan that may be able to help. He stated that he has the feeling that the parents can "do it" meaning raise the children. He has never seen [Father] asleep during a visit as reported and he stated that the family needs to keep working on it. He feels that the scalding incident should have been used as a learning opportunity as to what to do when that happens. The parents have learned about nutrition and are cooking. He believes that the short review of the case plan during the semi-annual review was not conducive to the family and should have been conducted in a way that accommodated the parents and their disability. He does not believe that CPSU honestly sought reunification. Sandford indicated that in every case he has been involved in with CPSU, the family was treated with respect and dignity. He testified that respect was lacking here. He believes that the care and concerns of the caseworker are exaggerated, that there should be a leap of faith by CPSU and the children returned to the parents.

Analysis of Permanent Custody of I.C.

{¶16} "[T]he right to raise one's children is an 'essential' and 'basic civil right.' " *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "The rights and interests of a natural parent are not,

however, absolute: where a court finds that permanent custody is appropriate under circumstances of a particular case and all due process safeguards have been followed, whatever residual rights a parent may have are properly divested." *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, and 5-02-54, 2003-Ohio-1269, ¶ 6.

**{¶17}** "Decisions concerning child custody matters lie within the sound discretion of the trial court and will not be reversed unless the trial court abused its discretion." *In re Leveck*, *supra*, ¶ 7, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). An abuse of discretion involves more than a mere error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "In reviewing this exercise of discretion, appellate courts must adhere to 'every reasonable presumption in favor of the lower court's judgment and finding of facts.' " *In re Leveck*, *supra*, at ¶ 7, quoting *In re Brodbeck*, 97 Ohio App.3d 652, 659, 647 N.E.2d 240 (1994).

**{¶18}** "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 08, 09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740,

¶ 13. Specifically, "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10.

{¶19} "The first prong of that test requires a finding by clear and convincing evidence that one of the statutorily-prescribed situations of R.C. 2151.414(B)(1) is satisfied." *In re N.F.*, 3d Dist. Marion No. 9-22-40, 2023-Ohio-566, ¶ 19. The statutory subsections related to the first prong concern, *inter alia*, whether the child cannot or should not be placed with the child's parents within a reasonable time (R.C. 2151.414(B)(1)(a)), or whether the child has been in the temporary custody of a children's services agency for twelve or more months of a consecutive twenty-two-month period (R.C. 2151.414(B)(1)(d).

{¶20} Once a trial court determines that the first prong of the test is satisfied, the trial court is directed to determine the best interests of the child. To determine the best interests of the child, R.C. 2151.414(D) directs the trial court to consider all relevant factors, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies

for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶21} Pursuant to R.C. 2151.414(B)(1), an award of permanent custody must be based on clear and convincing evidence. *In re H.M.* 3d Dist. Logan No. 8-18-46, 2019-Ohio-3721, ¶ 44. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477.

{¶22} In reviewing whether a trial court's permanent custody decision is against the manifest weight of the evidence, an appellate court " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Eastley v. Volkman*, 132 Ohio St.3d

328, 2012-Ohio-2179, at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist. 2001). Notably, however, issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier-of-fact. *Seasons Coal Co. Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis *sic.*) *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). " 'Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence.' " *In re A.B.*, 3d Dist. Marion No. 9-22-12, 2022-Ohio-4234, ¶ 12, quoting *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

{¶23} At the outset of our review, we note that neither parent challenges the trial court's determinations regarding R.C. 2151.414(B)(1) and the first prong of the permanent custody analysis on appeal, likely because the evidence affirmatively established that I.C. was in CPSU's custody for longer than twelve months of a consecutive twenty-two-month period. Nevertheless, even if a challenge was made

by Mother and Father, the trial court's findings are supported by the record and the first prong of the permanent custody analysis is satisfied.[2]

**{¶24}** As to the second prong of the permanent custody analysis, the trial court individually analyzed all of the factors in R.C. 2151.414(D)(1). We will review the trial court's findings to determine if they are supported by the evidence.

**{¶25}** Revised Code 2151.414(D)(1)(a) concerns the relationship of I.C. with his parents, siblings, relatives, and caregivers. The trial court determined that I.C. was thriving in his foster home by gaining weight, using a cup instead of a bottle, and speaking some words. By all indications I.C. was bonded to his foster family and his foster family indicated that it would consider adopting I.C. Further, I.C.'s foster mother specifically stated she would continue to maintain relationships between I.C. and S.C., and between I.C. and his natural parents even after the case was closed.

**{¶26}** According to his foster mother, I.C. had to be cajoled at times to get out of the vehicle to see his parents at visitation. Further, the trial court noted that I.C. had experienced some "regression" after visitation with his parents and there have been some incidents during visitation such as I.C. scalding himself with hot

---

[2] Under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for twelve or more months of a consecutive twenty-two-month period, a trial court need not find that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. *In re I.G.,* 3d Dist. Marion Nos. 9-13–43, 9–13–44, and 9-13-45, 2014-Ohio-1136, ¶ 30, citing R.C. 2151.414(B)(1)(d); *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 14. However, the trial court did also make the additional, superfluous finding that I.C. cannot and should not be placed with either parent within a reasonable time even though I.C. had been in the temporary custody of CPSU for twelve or more months of a consecutive twenty-two-month period.

water that were concerning. After weighing all the evidence, the trial court determined that an analysis of R.C. 2151.414(D)(1)(a) supported granting permanent custody. There is competent, credible evidence to support the trial court's determination.

{¶27} Revised Code 2151.414(D)(1)(b) concerns the child's wishes expressed by the child or through the child's GAL. Here, the trial court's analysis consisted of the following: "Although [I.C.] is now speaking some words, he is not able to express his wishes due to his autism diagnosis and his developmental disability." The trial court did not find that this factor weighed in favor of granting permanent custody or against granting permanent custody.

{¶28} In reviewing the trial court's findings, we note that although I.C. was unable to express his wishes, the GAL did express an opinion that I.C. should be returned to Mother and Father. Thus there was some additional evidence the trial court did not explicitly mention when analyzing this subsection that could favor denying the permanent custody motion.

{¶29} The next factor, Revised Code 2151.414(D)(1)(c) concerns the custodial history of I.C. and whether he had been in the temporary custody of CPSU for twelve or more months of a consecutive twenty-two-month period. The evidence was clear and unequivocal that I.C. had been in the temporary custody of CPSU for greater than twelve months of a consecutive twenty-two-month period, thus the trial

court found that this factor weighed in favor of granting permanent custody. The evidence supports the trial court's determination on this issue.

**{¶30}** Revised Code 2151.414(D)(1)(d) concerns I.C.'s need for legally secure placement and whether secure permanent placement can be achieved without CPSU taking permanent custody. Here, I.C.'s caseworker indicated he was in need of legally secure placement and the two psychologists testified that I.C.'s parents would simply never have the ability to effectively parent him without some type of assistance. In addition, we note that I.C.'s caregivers indicated that they were willing to adopt I.C. Based on the evidence presented the trial court determined that this factor weighed in favor of granting permanent custody.

**{¶31}** Finally, the trial court noted that none of the factors in R.C. 2151.414(E)(7)-(E)(11) were applicable in this case, thus R.C. 2151.414(D)(1)(e) did not apply here. We agree that there is no evidence to support the application of any of these factors.

**{¶32}** After considering all of the evidence, the trial court determined by clear and convincing evidence that granting permanent custody of I.C. to CPSU was in his best interest. The trial court emphasized that this case was "quite different from others in this situation" in that the parents had completed their caseplan and the issue that remained was their ability to apply what they had learned. Two separate clinical psychologists both testified that the parents in this case were

essentially incapable of successfully parenting these children due to their cognitive limitations.[3]

**{¶33}** Both Mother and Father argue that the trial court improperly based its entire decision on the limited cognitive abilities of the parents. The Supreme Court of Ohio stated in *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, that "[w]hen determining the best interest of a child under R.C. 2151.414(D) at a permanent-custody hearing, a trial court may not base its decision solely on the limited cognitive abilities of the parents."

**{¶34}** We find *D.A.* distinguishable from the case *sub judice*, as there are some notable differences between this case and *D.A.* For example, the Court in *D.A.* determined that there was no concern and no evidence regarding any harm or threat of harm to the children from the parents' intellectual deficiencies. Here, however, there were numerous allegations of physical abuse. In addition, even at the time of the final hearing the parents were failing to exhibit what they had learned in their classes by allowing I.C. to scald himself with hot water, allowing him to get out of the house, and by falling asleep during visitations.

**{¶35}** Furthermore, the evidence indicated that neither parent understood I.C.'s autism. In addition, the psychologists noted that even Mother, who was better with the children than Father, would need extensive help—she would need frequent

---

[3] The psychologists were classified as experts at trial with no objection.

monitoring and welfare checks and could only successfully parent for brief periods of time and at most for 24 hours. Thus this case has key differences from *D.A. See In re Robinson*, 3d Dist. Allen No. 1-08-24, 2008-Ohio-5311, ¶ 37 (distinguishing *D.A.* where limited intellectual functioning is tied to ability to provide an adequate home); *In re Cunningham Children*, 3d Dist. Nos. 13-08-27, 28, 29, 30, 2008-Ohio-5938.

**{¶36}** While we recognize that the GAL felt differently than the caseworkers and the psychologists in this case, after reviewing the record in its entirety we do not find the trial court abused its discretion by weighing the factors in favor of granting permanent custody of I.C. to CPSU. Therefore, Mother and Father's arguments related to this issue are not well-taken.

### Legal Custody of S.C.

**{¶37}** On appeal, we review the grant or denial of a motion for legal custody under an abuse-of-discretion standard. *In re B.P.*, 3d Dist. Logan Nos. 8-15-07 and 8-15-08, 2015-Ohio-5445, ¶ 21.

**{¶38}** Ohio's juvenile courts are statutory entities, and they are able to exercise only those powers that the General Assembly confers on them. *In re Z.R.*, 144 Ohio St.3d 380, 2015-Ohio-3306, ¶ 14. Revised Code Chapter 2151 grants a juvenile court exclusive original jurisdiction concerning a child alleged to be abused, neglected, or dependent. *In re A.D.*, 3d Dist. Seneca No. 13-22-12, 2023-Ohio-2442, ¶ 59.

**{¶39}** Following an adjudication of an abused, neglected, or dependent child, R.C. 2151.353(A) provides the juvenile court with certain dispositional alternatives for the child. Among the juvenile court's dispositional alternatives is granting legal custody of the child to either parent or to an individual who files a motion requesting legal custody. R.C. 2151.353(A)(3); *see also* Juv.R. 34(D).

The Revised Code defines "[l]egal custody" to mean

a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities. An individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by any section of the Revised Code or by the court.

R.C. 2151.011(A)(21).

**{¶40}** Importantly, "the award of legal custody is 'not as drastic a remedy as permanent custody.' " *In re J.B.*, 3d Dist. Allen No. 1-15-79, 2016-Ohio-2670, ¶ 32, quoting *In re L.D.*, 10th Dist. Franklin No. 12AP-985, 2013-Ohio-3214, ¶ 7. Unlike granting permanent custody, the award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 17. Significantly, the parents can generally petition the court for a custody modification in the future. *In re L.D.* at ¶ 7. Thus, "a parent's right to regain custody is not permanently foreclosed." *In re B.P.*, 3d Dist. Logan Nos. 8-15-07, 8-15-08, 2015-Ohio-5445, at ¶ 19.

**{¶41}** The standard a juvenile court uses in making its determination in a legal-custody proceeding (by "preponderance of the evidence") is less onerous than a permanent-custody proceeding (by "clear and convincing evidence"). *In re B.P.* at ¶ 19. Preponderance of the evidence means evidence that is more probable, more persuasive, or of greater probative value. *In re M.G.*, 3d Dist. Allen No. 1-18-54, 2019-Ohio-906, ¶ 7. At a dispositional hearing involving a request for legal custody, the focus is on the best interest of the child. *In re B.P.* at ¶ 19.

**{¶42}** However, Revised Code 2151.353(A)(3) does not list specific factors a court should consider in deciding what is in the child's best interest pursuant to the requested disposition of legal custody. *In re B.P.* at ¶ 20. Nevertheless, we have previously concluded that juvenile courts may be guided by the factors listed in R.C. 2151.414(D)(1) (the permanent-custody factors) or R.C. 3109.04(F)(1) (factors employed in private-custody disputes) since they may be instructive. *In re L.P.*, 3d Dist. Seneca Nos. 13-12-60 and 13-12-61, 2013-Ohio-2607, ¶ 22. In addition to the foregoing factors, the juvenile court must also liberally interpret and construe R.C. Chapter 2151 so as to effectuate the General Assembly's expressed purpose when considering which situation will best promote the child's "care, protection, and mental and physical development," understanding that the child should only be separated from his or her parents "when necessary for the child's welfare or in the interests of public safety." *In re C.W.*, 2010-Ohio-2157, at ¶ 11, citing R.C. 2151.01(A).

{¶43} When analyzing the motion for legal custody of S.C. in its final judgment entry, the trial court again individually listed and analyzed the best interest factors in R.C. 2151.414(D)(1). The trial court also listed and analyzed the factors in R.C. 3109.04(F) where applicable. We will review the trial court's findings regarding the factors.

{¶44} With regard to R.C. 2151.414(D)(1)(a) and the relationship between S.C. and her parents and caregivers, the trial court determined that S.C. was thriving in her placement. S.C.'s seizures were being treated, she was bonded to Jessica and Jesse D. The trial court also determined that while S.C. was bonded with her mother, she did not have a close relationship with her father. The trial court found that the evidence supported granting the motion for legal custody. This decision is supported by the evidence.

{¶45} With regard to R.C. 2151.414(D)(1)(b), the trial court did find that the GAL expressed S.C.'s desire to be reunited with her parents. The trial court found that this factor favored reunification, and that determination is supported by the record.

{¶46} With regard to R.C. 2151.414(D)(1)(c), the trial court determined that S.C. had been placed outside her home for well over twelve months, albeit in a relative's custody and not in CPSU's custody. The trial court determined this factor supported granting the motion for legal custody and that is supported by the record.

**{¶47}** The trial court determined R.C. 2151.414(D)(1)(d) did not apply because permanent custody was not sought here; however, permanency was important according to S.C.'s caseworker, thus unlike the trial court, we find it has some relevance supporting granting the legal custody motion.

**{¶48}** The trial court determined that R.C. 2151.414(D)(1)(e) did not apply, which supported reunification. The trial court's finding is supported by the record.

**{¶49}** The trial court then addressed R.C. 3109.04(F) factors where the information had not been covered elsewhere. The trial court determined that R.C. 3109.04(F)(1)(d) and S.C.'s adjustment to home, school, and community favored granting the legal custody motion. Further, the trial court determined that R.C. 3109.04(F)(1)(e) related to the mental and physical health of all involved favored granting the legal custody motion as exhibited through S.C.'s seizure disorder being controlled in her placement and the parents' cognitive deficiencies. The trial court determined that R.C. 3109.04(F)(1)(f) through (F)(1)(j) were not applicable to this case. All of these findings are supported by the record.

**{¶50}** After analyzing all the evidence and making findings, the trial court determined that it was in S.C.'s best interests that Jessica and Jesse D. be granted legal custody of her. Mother and Father again argue that under *In re D.A.*, *supra*, the decision here was improperly based solely on the limited cognitive ability of the parents. However, *D.A.* is distinguishable for the same reasons previously stated when analyzing I.C.'s case, and, in S.C.'s case, for the additional fact that Jessica

and Jesse D. are only being awarded legal custody of S.C. The *D.A.* decision involved permanent custody and would not control here, particularly given that the parents could still petition for rights. Thus *D.A.* has even less relevance here than it did in I.C.'s case.

{¶51} Since the record supports the trial court's difficult decision in this matter, we do not find that the trial court abused its discretion or clearly lost its way. Therefore Mother's first assignment of error and Father's first and second assignments of error are overruled.

*Mother's Second Assignment of Error*

{¶52} In Mother's second assignment of error, she argues that the trial court erred by holding a single hearing for both the permanent custody motion related to I.C. and the legal custody motion of S.C.

{¶53} At the outset, we emphasize that Mother never objected to the trial court holding a single hearing for both the permanent custody motion of I.C. and the legal custody motion of S.C. For this reason alone we could overrule her assignment of error. Nevertheless, we emphasize that the witnesses for the motions were largely the same (other than the current caregivers), so judicial economy favored holding the hearings simultaneously. Moreover, it is not uncommon for legal custody motions and permanent custody motions to be pending simultaneously. *See, e.g.*, *In re N.F.*, 3d Dist. Marion No. 9-22-40, 2023-Ohio-566.

**{¶54}** Finally, Mother's principal complaint with the hearings being held simultaneously is that the trial court heard testimony that S.C. was "failure to thrive" when that was not the case and Mother contends that the trial court incorrectly relied upon this "failure to thrive" in reaching its decision. However, as appellee points out, Mother does not cite to the transcript where this purportedly inaccurate testimony occurred or to where the trial court improperly relied upon it in reaching its decision. In our own review of the transcript, the testimony indicated that *I.C.* was "failure to thrive" and that was an issue more for *him* than S.C. (Tr. at 218-219). Thus we see no indication that there was improper testimony here. Further, we see no indication that the trial court relied upon anything improper or inaccurate on this issue in its entry. Thus Mother's arguments themselves are inaccurate. For all of these reasons, Mother's second assignment of error is overruled.

*Mother's Third Assignment of Error*; *Father's Third Assignment of Error*

**{¶55}** Mother and Father both argue in their respective third assignments of error that the trial court erred by determining that CPSU engaged in reasonable efforts to support reunification.

Relevant Authority

**{¶56}** The Ohio Revised Code imposes a duty on the part of children's services agencies to make reasonable efforts to reunite parents with their children when the agency has removed the children from the home. *In re J.D.*, 3d Dist. Hancock No. 5-10-34, 2011-Ohio-1458, ¶ 14, citing R.C. 2151.419. To that end,

case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id.*

**{¶57}** Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id.* "Nevertheless, [when considering reasonable efforts,] the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." *In re Leveck,* 3d Dist. Nos. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 10.

Analysis

**{¶58}** Although Mother and Father contend that the trial court erred by finding in its final judgment entries that CPSU engaged in reasonable efforts to support reunification in this case, the trial court had previously determined that CPSU engaged in reasonable efforts to reunify the family in earlier judgment entries. Generally, a children's services agency is required to demonstrate reasonable efforts prior to filing a permanent custody motion[4], not at the permanent custody hearing, *unless it has failed to do so previously*. *In re S.S.*, 4th Dist. Jackson Nos. 16CA7, 16CA8, 2017-Ohio-2938, ¶ 166-169. "Because the trial court entered a reasonable efforts finding before placing the children in the agency's permanent custody," it was not required to do so again. *See id*.

---

[4] *See* R.C. 2151.413(D)(3)(b).

{¶59} Nevertheless, in the interests of justice we will review Mother and Father's assignments of error. In its final entries, the trial court used substantially similar language related to finding that CPSU had engaged in reasonable efforts in this case, reading as follows:

> The Court further finds that reasonable efforts have been made by CPSU in that service have been made to the parents including a search for relatives, visitation, home-coaching, food assistance, housing assistance, mental health counseling, domestic violence counseling, services through MRDD, alarms for doors and windows, and psychological evaluations. The Court finds further that reasonable efforts to finalize a permanency plan have been made by CPSU in that they have conducted a search for relatives and have filed for permanent custody.

{¶60} In an attempt to undermine the trial court's findings, Mother and Father argue that the case plan did not recognize that the parents completed their objectives. Further, Mother and Father argue that CPSU continued to add "new hoops to jump through" whenever they completed an objective.[5]

{¶61} However, we emphasize that the law does not require a trial court to consider whether there was anything more CPSU could have done, but whether the case planning was reasonable under the circumstances. *See In re N.F.,* 3d Dist. Marion No. 9-22-40, 2023-Ohio-566. Here, CPSU connected Mother and Father to services and provided assistance. By all accounts, Mother and Father were compliant with the case plan. The primary issue was their cognitive inability to ever

---

[5] Mother also argues that the reasonable efforts statute is unconstitutional, but this was not raised at the trial court level and thus need not be heard for the first time on appeal. *State v. Awan*, 22 Ohio St.3d 120, 489 N.E.2d 277 (1986), at syllabus.

fulfil their parental roles and apply what they had learned for the benefit of their children. The caseworker testified that while the parents had completed their case goals, the problem was with their implementation of what they learned over the long term. Testimony indicated areas where the parents were still failing to apply what they had learned.

**{¶62}** In sum, the testimony presented detailed the efforts of CPSU in this matter and the parents' compliance, or at least the attempts of the parents to comply with the case plan. Given the evidence presented, we do not find that the trial court erred here. For all of these reasons, Mother and Father's third assignments of error are overruled.

*Conclusion*

**{¶63}** Having found no error prejudicial to Mother or Father in the particulars assigned and argued, the assignments of error are overruled and the judgments of the Hancock County Common Pleas Court, Juvenile Division, are affirmed.

***Judgments Affirmed***

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/eks**