[Cite as *In re S.C.*, 2025-Ohio-226.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

IN RE:

    S.C.,                                CASE NO. 4-24-15

DEPENDENT CHILD.

[CHELSEY B. - APPELLANT]             O P I N I O N
[ROBERT C. - APPELLANT]

IN RE:

    A.C.,                                CASE NO. 4-24-16

DEPENDENT CHILD.

[CHELSEY B. - APPELLANT]             O P I N I O N
[ROBERT C. - APPELLANT]

**Appeals from Defiance County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. 35107 and 35108**

**Judgments Affirmed**

**Date of Decision: January 27, 2025**

APPEARANCES:

    *Timothy C. Holtsberry* **for Appellant Robert C.**

    *Autumn D. Adams* **for Appellant Chelsey B.**

    *Chelsea R. Cereghin* **for Appellee**

**WALDICK, P.J.**

{¶1} Mother-appellant, Chelsey B. ("Mother"), and father-appellant, Robert C. ("Father"), bring these appeals from the May 21, 2024 judgments of the Defiance County Common Pleas Court, Juvenile Division. On appeal, Mother argues that the trial court's determination to grant permanent custody of the minor children S.C. and A.C. to the Defiance/Paulding Consolidated Job and Family Services ("the Agency") was against the manifest weight of the evidence. Separately, Father also argues that the trial court erred by granting permanent custody of the children to the Agency. In addition, Father argues that the trial court erred by determining that the Agency engaged in reasonable efforts to reunify the family, and that the trial court erred by finding that the Agency was not in contempt. For the reasons that follow, we affirm the judgments of the trial court.

*Background*

{¶2} Mother and Father had two children together: S.C., born in July of 2019, and A.C., born in December of 2020. Shortly after S.C. was born, the Agency began receiving reports related to the children for, *inter alia*, the children missing necessary medical appointments.

{¶3} An agency called "Help Me Grow" worked with the family beginning in July of 2019. However, even with Help Me Grow's assistance, S.C. was

diagnosed "failure to thrive" in April of 2021, and A.C. was diagnosed failure to thrive in April of 2022.

{¶4} Mother and Father entered into a voluntary case plan with the Agency in 2022 due to the ongoing concerns with the children. However, on July 11, 2022, when the ongoing concerns were not remedied and the children continued to miss necessary medical appointments, the Agency filed a complaint alleging that S.C. and A.C. were dependent and neglected children.

{¶5} On August 31, 2022, Mother and Father admitted that the children were dependent as alleged in the complaint and the remaining allegations were dismissed. Disposition was held on October 7, 2022. The children were ordered to remain the temporary custody of the Agency.

{¶6} As the case proceeded, the parents engaged in the case plan to varying degrees. After numerous relative placements had been investigated and determined not to be appropriate for placement, and after the parents failed to complete the case plan, the Agency filed for permanent custody of the children.

{¶7} A hearing was held on the Agency's motion on March 20-21, 2024. On May 21, 2024, the trial court filed a judgment entry analyzing all the evidence in the case and determining that permanent custody of the children should be awarded to the Agency. Both parents now appeal the trial court's judgment, asserting the following assignments of error for our review.

**Mother's Assignment of Error**

**It was against the manifest weight of the evidence for the Trial Court to grant permanent custody of the children to the Agency as Mother completed case plan services while the Agency failed to use reasonable case planning to reunify the children with mother.**

**Father's First Assignment of Error**

**The trial court was in error by finding that evidence by clear and convincing that one of the statutory factors in R.C. 2151.414(E) were met when requesting a grant of permanent custody to the agency.**

**Father's Second Assignment of Error**

**The trial court was in error in finding that there was testimony by the clear and convincing evidence standard that the statutory factors in R.C. 2151.414(D) were met when requesting a grant of permanent custody to the agency.**

**Father's Third Assignment of Error**

**Granting permanent custody to the agency when the agency did not use reasonable case planning and diligent efforts at reunification is contrary to law.**

**Father's Fourth Assignment of Error**

**The trial court was in error in not finding that agency was guilty of contempt when it did not comply with the court's direction to adhere to father's motion for extended visitation in an effort to effectuate the reunification.**

{¶8} Where the assignments of error overlap, we will address them together.

*Father's First Assignment of Error*

**{¶9}** In Father's first assignment of error, he argues that the trial court erred by determining that "one of the statutory factors in R.C. 2151.414(E) was met" in this case. Revised Code 2151.414(E) is relevant in a permanent custody analysis when a trial court makes a finding under R.C. 2151.414(B)(1)(a) that "a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents[.]"

Relevant Authority

**{¶10}** The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 2003-Ohio-5885, ¶ 7 (3d Dist.). These rights may be terminated under appropriate circumstances when all due process requirements have been met. *In re Leveck*, 2003-Ohio-1269, ¶ 6 (3d Dist.).

**{¶11}** Revised Code 2151.414 sets forth specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child. *In re C.F.*, 2007-Ohio-1104, ¶ 22. Specifically, there are two separate elements that must be established by clear and convincing evidence: (1) one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) must apply; and (2) granting

permanent custody to an agency must be in the child's best interest. R.C. 2151.414(B)(1). If the trial court makes these statutorily required determinations, a reviewing court will not reverse a trial court's decision unless it is not supported by clear and convincing evidence. *In re H.M.K.*, 2013-Ohio-4317, ¶ 43 (3d Dist.).

Analysis

**{¶12}** Father argues that the trial court erred by determining that the Agency had satisfied the first prong of the permanent custody test. More specifically, he argues that the trial court erred by determining that the children "cannot be placed with either parent within a reasonable period of time or should not be placed with the parents" pursuant to R.C. 2151.414(B)(1)(a).

Relevant portions of Revised Code 2151.414(B)(1) read as follows:

(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's

parents within a reasonable time or should not be placed with the child's parents.

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶13} Importantly, the findings under R.C. 2151.414(B)(1)(a) and (B)(1)(d) are alternative findings. *In re M.R.*, 2013-Ohio-1302, ¶ 80 (3d Dist.). Either finding is sufficient to use as a basis to grant an Agency's motion for permanent custody. *In re L.L.*, 2015-Ohio-2739, ¶ 11 (3d Dist.). Moreover, if the trial court determines that *any* provision enumerated in R.C. 2151.414(B)(1) applies, the trial court must proceed to determine whether granting the Agency permanent custody of the child is in the child's best interest. *Id*. at ¶ 13.

{¶14} In this case, the trial court determined that *both* R.C. 2151.414(B)(1)(a) and (B)(1)(d) were applicable. As stated previously, these are alternative findings and only *one* is required to proceed to the second step of the permanent custody analysis.

{¶15} Father makes no argument with regard to the trial court's finding under R.C. 2151.414(B)(1)(d). This provision requires a child to be in the temporary

custody of the Agency for twelve or more months of a consecutive twenty-two month period.

**{¶16}** The evidence herein established that the children were adjudicated dependent on August 31, 2022. The children were in the temporary custody of the Agency at that time. Then, the Agency filed its motion for permanent custody on December 11, 2023. Thus when the Agency filed its motion for permanent custody, the children had been in the temporary custody of the Agency for greater than twelve or more months of a consecutive twenty-two month period, satisfying R.C. 2151.414(B)(1)(d).

**{¶17}** Since the trial court's finding regarding R.C. 2151.414(B)(1)(d) is supported by the record, even if we assumed, without finding, that the trial court erred with regard to its analysis of R.C. 2151.414(B)(1)(a) or R.C. 2151.414(E) as Father suggests, there is no remedy to be provided here. The trial court correctly found that one of the provisions in R.C. 2151.414(B)(1) was present, thus it was required to proceed to the best interests analysis. Father's claims in his first assignment of error are thus entirely irrelevant to the determination of this appeal, and his assignment of error is overruled.

*Mother's Assignment of Error; Father's Second Assignment of Error*

**{¶18}** In Mother's assignment of error, she argues that the trial court's determination to grant the Agency's motion for permanent custody was against the manifest weight of the evidence. In Father's second assignment of error, he also

argues that the trial court's determination regarding the children's best interests under R.C. 2151.414(D) was against the manifest weight of the evidence.

## Standard of Review

{¶19} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

## Relevant Authority

{¶20} An agency that seeks permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re B.C.*, 2014-Ohio-4558, ¶ 26. Revised Code 2151.414(D)(1) sets forth a non-exhaustive list of factors the trial court must consider when determining whether granting a permanent custody motion is in the child's best interests. Revised Code 2151.414(D)(1) reads as follows:

> (D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶21}** The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated.

Evidence Presented at the Permanent Custody Hearing

**{¶22}** Issues with Mother's and Father's inattention to the children's needs began almost immediately after S.C. was born in July of 2019 with reports being

made to the Agency of the child missing medical appointments and Mother not being able to properly care for the child.

**{¶23}** An organization called "Help Me Grow" became involved to assist the parents. Help Me Grow employees found Father not to be involved with the children while Mother missed cues indicating the children were hungry and needed fed. Mother would also leave the infant children alone while she smoked cigarettes on the front porch. Employees of Help Me Grow engaged with the parents but the parents largely never demonstrated any progress and instructions were not implemented.

**{¶24}** Despite the repeated attempts to assist the parents, S.C. and A.C. were both diagnosed failure to thrive. The children were developmentally delayed and the parents were not taking the children to necessary medical appointments. For example, A.C. had a "flat head" and a helmet was recommended for her. The parents did not follow up either with further appointments or obtaining the helmet. In addition, one child had high "lead levels" and it was recommended that she be retested but that was never done. One child had blood in her stool and that was not followed-up with a visit to a medical provider. Perhaps most concerning, both children's medical providers recommended occupational therapy, physical therapy, and speech therapy to address the children's issues, but the parents failed to regularly engage with the recommended treatment. The parents' inability to take

proactive action and their inability to follow-through with recommendations became a theme throughout the testimony.

{¶25} The children were removed from the parents' care and placed with a certified foster family. When the children were placed with the foster family, the foster mother noted the children had no interaction with each other as though they were not siblings. S.C., who had just turned three, had an unhealthy diet. She was cross-eyed and needed to go to an eye doctor. She also had her "knees kind of turned in" and she "fell a lot because of that." (Tr. at 65). S.C. could only say a couple of words. She was "very dirty" with matted hair. She was terrified of baths and there was no prior attempt at "potty training." (*Id*. at 66). The foster mother testified that the children were the "most severe cases" she had as far as malnourishment. She testified that she "truly believe[d] if [A.C.] was left a few more months like that, I do not know if she would have survived." (Tr. at 91).

{¶26} Since being placed with the foster family, S.C. has been in regular physical and occupational therapy and she "has just blossomed." *Id*. She has bonded with her siblings and she was speaking significantly more. S.C. was still behind her peers in development but rapidly improving. However, S.C. showed some regression after visits with her parents.

{¶27} A.C. was nineteen months old when she was placed in the foster home. She was tiny, dirty, and her coloring was poor. A.C. was described as being at "about a six-month-old level" and was wearing "nine-month" clothing and "size one

diapers." (Tr. at 73, 76). She could not grab things with her hands, and she had issues chewing and swallowing. At nineteen months she was only eating baby food or purees. At three years old, while with the foster family, she was starting to eat "table food." A.C.'s foster mother had A.C. evaluated by a neurologist. The neurologist thought A.C. was "a good year and a half behind her normal development." A.C. was placed in speech therapy and was doing well, but she would shut down when Mother attended the sessions.

{¶28} As for the parents, Father worked outside the home. When the children were young the testimony indicated that Father was largely the breadwinner while Mother cared for the children.

{¶29} Caseworkers indicated that there were other people staying at the parents' residence for extended periods of time. During the majority of the children's lives, Mother and Father lived together but they were never married. Testimony indicated that the parents did not appear to understand the importance of the safety of the children. A man named C.J. was purportedly taking care of and bathing the children. A man named "Greg" lived in the home for some time but it is unclear who he was or what his relationship was to the parents.

{¶30} Father was not involved with initial case-planning in this matter but he eventually requested to be involved when he thought Mother might not be able to complete her case plan. The parents engaged with supervised visitation with the children for one hour per week. They never proceeded beyond supervised visitation.

{¶31} The visitation supervisor noted that Father was often disengaged, quiet, and on his own during the supervised visitation. Although there were times when he was engaged to a degree, Father was unresponsive to the children's needs. Father would do "his own thing" unless Mother directed him to do something with the children. (Tr. at 226). He attended one visitation dressed in a bath robe while Mother presented at the same visitation as dirty, with matted and greasy hair. Both parents forgot their child's birthday.

{¶32} While Mother and Father were still living together, Mother became pregnant by her ex-husband. Father eventually left the residence he shared with mother and moved into a home with his step-father. The home was being remodeled and, according to all testimony including Father's, the home was not in a suitable condition for children and would not be for, at least, several months.

{¶33} Meanwhile, Mother had her third child and got into a relationship with a different male named Jayden. Mother and Jayden moved in together and they were not allowing Agency workers access to their home. The testimony indicated that Mother had mental health issues that she would not consistently address.

{¶34} Both parents missed numerous supervised visitation appointments with the children. In the months before the permanent custody hearing, Father's supervised visitation was suspended due to him missing two visitations in a row without contacting the supervisor. At the final hearing Father testified that he wanted to get the hearing over with before he dealt with reinstating visitation.

{¶35} Both Mother and Father testified at the final hearing. When Father was asked if he had wanted extended supervised visitation with the children, he spoke about his schedule being difficult. He also testified that he hoped his home could be ready for the children within four months, but he was not certain when it would be. He noted he did not have health insurance at the time of the final hearing.

{¶36} Mother testified that she believed that she had completed the case plan. She accused the various caseworkers of providing false testimony.

{¶37} Finally, the children's GAL testified that the parents had not made significant progress in understanding the issues that led to the case. The GAL indicated that the parents were disengaged and did not implement what they had been taught. The GAL recommended that the trial court grant the Agency's motion for permanent custody of the children.

Analysis

{¶38} In determining the children's best interests in this case, the trial court individually addressed each of the statutory factors contained in R.C. 2151.414(D). We will summarize the trial court's findings and determine whether they are clearly and convincingly supported by the evidence.

{¶39} With regard to R.C. 2151.414(D)(1)(a), which concerns the interrelationship of the children with their parents, siblings, and caregivers, the trial court determined that S.C. and A.C. had a strong bond with their foster parents and foster family. The trial court noted that the children had some bonding relationship

with their parents. Nevertheless, the trial court determined that the children thrived in their foster home. The trial court also noted that the children did not have a relationship with Mother's live-in boyfriend Jayden, and they did not have a recent relationship with Father's live-in step-father.

{¶40} With regard to R.C. 2151.414(D)(1)(b), which concerns the wishes of the child as expressed through the GAL, the GAL recommended that the Agency be granted permanent custody.

{¶41} With regard to R.C. 2151.414(D)(1)(c), which concerns the custodial history of the child, the evidence established that the children had been in the custody of the Agency since July of 2022, and they were adjudicated dependent on August 31, 2022. Thus the children had been in the temporary custody of the Agency for twelve or more months of a consecutive twenty-two month period.

{¶42} With regard to R.C. 2151.414(D)(1)(d), which concerns the child's need for legally secure placement, the trial court again noted that the children were "thriving" in foster care. The trial court determined:

> Their ongoing significant medical needs are being met. Removing them from their current level of care would be detrimental to them. There are no appropriate and/or able relatives to care for the children. No placement can be achieved without a grant of permanent custody.

{¶43} With regard to R.C. 2151.414(D)(1)(e), which references whether any sections of R.C. 2151.414(E)(7)-(11) apply, the trial court determined that the parents had repeatedly withheld medical treatment from the children pursuant to

-16-

R.C. 2151.414(E)(8). The trial court determined that medical records established that the parents failed to follow through with recommendations of medical providers and the children's needs were not being met. After reviewing all of the factors, the trial court determined that granting the Agency's motion for permanent custody was in the children's best interests.

{¶44} Father attempts to undermine the trial court's decision by arguing that he had completed the case plan, and his mental health was listed as a strength at one time. Mother argues that she also had completed the case plan and had remedied the reasons for removal. Essentially both parents ask us to re-weigh the factors of R.C. 2151.414(D)(1) and consider various pieces of evidence more strongly in their favor.

{¶45} After considering all of the evidence in the record, we find that there is clear and convincing evidence to support the trial court's decision. Numerous factors clearly weigh in favor of granting the permanent custody motion. For example, the children have been in the custody of the Agency for a significant period of time. They are thriving in foster care. The GAL recommended that the motion be granted. The parents had not progressed beyond supervised visitation and were still missing appointments illustrating a lack of commitment.

{¶46} Further, the parents displayed continued poor judgment. Mother had another child with her "abusive" ex-husband and she moved in with a different man as soon as Father moved out of the house. Father moved into a home that was not

suitable for children and was not making efforts to find a residence that was suitable for the children. The parents' actions throughout the case are indicative of parents' failure to be proactive for their children's well-being. On balance, although there were some positives and some progress with both parents, the evidence is clear and convincing that the Agency's motion should be granted. Therefore, Mother's first assignment of error, and Father's second assignment of error, are overruled.

*Father's Third Assignment of Error*

{¶47} In his third assignment of error, Father argues that the Agency did not use reasonable case planning efforts to reunify the family. Notably, although Mother only asserted one assignment of error, her brief touches on this issue as well, thus we will address the assignment of error related to both parents.

Relevant Authority

{¶48} "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.*, 2007-Ohio-1104, ¶ 29. Revised Code 2151.419(A)(1) requires a trial court to determine whether a children's services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional

hearings for abused, neglected, or dependent children[.]" *In re C.F.* at ¶ 41; *accord In re R.R.*, 2021-Ohio-1620, ¶ 78 (3d Dist.).

**{¶49}** Notably, the Supreme Court of Ohio concluded that " '[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.' " *In re C.F.* at ¶ 41, quoting *In re A.C.*, 2004-Ohio-5531, ¶ 30 (12th Dist.). Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody." *Id.* at ¶ 42. "[If] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

**{¶50}** In *In re R.R.*, 2021-Ohio-1620, ¶ 79 (3d Dist.), this Court applied the Supreme Court of Ohio's holding in *In re C.F.* and determined that because the trial court previously made reasonable-efforts findings, an agency was not required to prove, nor was the trial court required to find, that the agency used reasonable efforts to reunify parents with their children before the trial court could grant permanent custody to the agency.

Analysis

**{¶51}** Although the parents argue that the trial court erred by determining in its final judgment entry that the Agency engaged in reasonable efforts to support reunification, the trial court had previously determined that the Agency engaged in

reasonable efforts to reunify the family at multiple earlier points in this case. Generally, a children's services agency is required to demonstrate reasonable efforts prior to filing a permanent custody motion, not at the permanent custody hearing, *unless it has failed to do so previously*. *In re I.C.*, 2023-Ohio-4707, ¶ 58 (3d Dist.), citing *In re S.S.*, 2017-Ohio-2938, ¶ 166-169 (4th Dist.). "Because the trial court entered a reasonable efforts finding before placing the children in the agency's permanent custody," it was not required to do so again. *See id.*

**{¶52}** Nevertheless, in the interest of justice we will review the parties' arguments, particularly since the trial court made another "reasonable efforts" finding in its final judgment entry. Here, the Agency engaged the parents with a case plan and numerous services were offered to the parents. Many possible relative placements were investigated, and of those relatives were not rejected, the relatives were unwilling to take the children. The Agency worked with the parents alongside Help Me Grow and even Help Me Grow noted that the parents had not made progress with their program and curriculum. Further, the supervised visitation monitor noted numerous issues with the parents and ongoing concerns with the parents' parenting skills.

**{¶53}** Moreover, neither parent could demonstrate that they had a home suitable for the children at the time of the final hearing. Further, Mother was non-compliant with her mental health treatment and Father had not visited with the

children since January of 2024. Thus the parents were not completely engaging in the process.

{¶54} When considering reasonable efforts, the issue is not whether there was anything more that the Agency could have done, but whether the case planning and efforts were reasonable and diligent under the circumstances of this case. *In re Leveck,* 2003-Ohio-1269, ¶ 10 (3d Dist.). There is no indication that there is anything more that the Agency could have done to assist the parents in this matter that would have made them understand the importance of the children's issues. Therefore, Father's second assignment of error is overruled.

*Father's Fourth Assignment of Error*

{¶55} In Father's fourth assignment of error, he argues that the trial court erred by denying his motion to hold the Agency in contempt for suspending his supervised visitation after he had missed two consecutive appointments with the children without calling.

{¶56} At the final hearing, Father testified that he was aware of his visitation with the children on February 14 and February 21, 2024, but he slept through both. He did not contact the visitation monitor to indicate he would not be present for his visitation. Per policy, Father's visitations were suspended.

{¶57} Father first argues that the Agency should have been held in contempt for suspending his visitation unjustly. However, Father was aware of his appointments and he missed them through no fault of the Agency. In fact, Father

had the ability to reinstate his visitation, but he did not attempt to do so prior to the final hearing. We can find no error with the trial court denying Father's motion for contempt where Father's own actions led to the suspension of his visitation.

**{¶58}** Separately, Father argues that the Agency should have been held in contempt for not extending his visitation after the trial court directed the Agency to begin extending visitation at the end of 2023. However, testimony indicated that after there was a decision to extend visitation, there was significant animosity between the parents during a joint visitation, particularly over Mother's new child. Visitations then had to be separated. After the visitations were separated, Father had multiple no-shows. Given the evidence presented, we can find no error here with the trial court declining to find the Agency in contempt. Therefore, Father's fourth assignment of error is overruled.

*Conclusion*

**{¶59}** Having found no error prejudicial to Mother and Father in the particulars assigned and argued, their assignments of error are overruled. The judgments of the Defiance County Common Pleas Court, Juvenile Division, are affirmed.

*Judgments Affirmed*

**ZIMMERMAN and MILLER, J.J., concur.**

**/jlm**