[Cite as *In re P.S.*, 2025-Ohio-4726.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

IN RE:

    P.S.,

ADJUDICATED DEPENDENT
CHILD.

[REBECCA H. – APPELLANT]
[JONATHAN S. – APPELLANT]
[ASHLEY H. – APPELLANT]

**CASE NO. 6-25-03**

**OPINION AND
JUDGMENT ENTRY**

IN RE:

    N.S.,

ADJUDICATED DEPENDENT
CHILD.

[REBECCA H. - APPELLANT]
[JONATHAN S. – APPELLANT]
[ASHLEY H. – APPELLANT]

**CASE NO. 6-25-04**

**OPINION AND
JUDGMENT ENTRY**

**Appeals from Hardin County Common Pleas Court
Domestic Relations Division
Juvenile Section
Trial Court Nos. 20223033 and 20223032**

**Judgments Affirmed**

**Date of Decision: October 14, 2025**

Case Nos. 6-25-03, 04

**APPEARANCES:**

*Howard A. Elliott* **for Appellant, Ashley Hudson**

*Linda Gabriele* **for Appellant, Jonathan Steele**

*Alison Boggs* **for Appellant, Rebecca Harris**

*McKenzie Klingler* **for Appellee**

**WALDICK, P.J.**

{¶1} Mother-appellant ("Mother"), father-appellant ("Father"), and maternal grandmother/legal custodian ("Rebecca"), bring these appeals from the January 28, 2025 judgments of the Hardin County Common Pleas Court, Domestic Relations Division, Juvenile Section, granting permanent custody of N.S. and P.S. to the Hardin County Department of Job and Family Services ("JFS").[1] The appellants all make various arguments challenging the trial court granting permanent custody of the children to JFS. For the reasons that follow, we affirm the judgments of the trial court.

---

[1] When referred to collectively, we will address Mother, Father, and Rebecca as "appellants."

*Background*

{¶2} N.S. was born in October of 2015. P.S. was born in October of 2019. Both children have special needs.[2]

{¶3} Mother and Father are the parents of N.S. and P.S. Both Mother and Father are illiterate, with Mother having an IQ of 48. Father is described as "a little" more intelligent than Mother, but he is still described as "low functioning" and he struggles to understand things like basic questions about his own finances, let alone the children's special needs. Neither Mother nor Father had a driver's license.

{¶4} The children were both involved in a prior "dependency" case with JFS from January of 2020 to January of 2022. The prior case concluded with legal custody of both children being granted to Rebecca.

{¶5} Generally, Mother and Father live with Rebecca when the appellants have housing, though for a significant portion of this case the family unit was homeless. Mother receives approximately $750 a month in disability payments. Father works at a junkyard for cash, under-the-table, making what he claimed was $250 weekly.[3] Rebecca is not employed and she uses the disability payments for Mother to take care of the family unit even though the payments are designated specifically for Mother's care.

---

[2] N.S. has "Corpus Callosum Syndrome, developmental delays, toe walking, dysarthia, spastic diplegia, and equinus contracture of the ankle." (JFS Ex. 5). P.S. was described as having "lissencephaly," "global truncal hypotonia," a "gene mutation" and autism. (Tr. at 154).

[3] Father was asked during a parenting evaluation how much his earnings would be in a month if he was paid $250 per week, and Father could not "add those figures." (JFS Ex. 20).

{¶6} The instant case began after JFS received a report in October of 2022 regarding N.S.'s physical condition. N.S. was said to have a "strong odor" and he was said to be wearing the same diapers each day to school. It was also reported that N.S. was not wearing the braces for his legs, which were medically necessary and dangerous for him not to be wearing. In addition, N.S. reported dental pain and was having difficulty eating. N.S.'s teeth were black and rotted.

{¶7} When JFS met with Rebecca, JFS learned that Rebecca was not "follow[ing] through" with N.S.'s medical care. Nearly all of N.S.'s teeth needed removed, and N.S. had lost 8 pounds in a month.

{¶8} The home appellants were living in with N.S. and P.S. was described as "extremely dirty," with cockroaches in the home and furniture full of excrement and bugs. After learning of all the issues, JFS filed a complaint alleging that the children were neglected as defined in R.C. 2151.03, and dependent as defined in R.C. 2151.04. Due to the cognitive limitations of Mother and Father, GALs were appointed for both of them.

{¶9} The matter proceeded to an adjudication hearing wherein Mother, Father, and Rebecca all admitted that the children were dependent due to medical neglect and home conditions. Disposition was held December 21, 2022, and the children were ordered to remain in the temporary custody of JFS.

{¶10} Over the ensuing months, Mother, Father, and Rebecca all worked on their case plan goals. As part of the case plan goals, the appellants were ordered,

*inter alia*, to obtain stable and safe housing, to complete parenting classes, and to undertake psychological/parenting evaluations. The appellants readily complied with many of the case plan's requirements, including taking classes and getting evaluations.

{¶11} However, at the time the appellants participated in the parenting evaluation in February of 2023 and June of 2023, the appellants were "unhoused," living on the street or staying in motels or with friends as they could. Further, the forensic psychologist's report indicated that:

> This evaluation does not find that any of the adults could be effective parents to their children. Much of these adult's [sic] inability to manage their own lives effectively, stems from a general low level of intellectual functioning that prevents them from establishing a stable homestead, where their children could grow and prosper.

(JFS Ex. 23).

{¶12} In a separate psychological evaluation, a psychologist determined that Father and Mother "should not have primary parental rights and responsibilities, and their contact with the children should be supervised." (JFS Ex. 22). With regards to Rebecca, the psychologist noted communication issues. In addition, he noted that Rebecca repeatedly provided inaccurate information, and she minimized or failed to recognize problems. The psychological evaluation indicated that primary parenting responsibilities were not recommended for any of the appellants at the time, though it was technically *possible* that Rebecca could parent the children in

the future *if* she utilized the appropriate resources, demonstrated stability, and developed skills.[4] (JFS Ex. 32).

{¶13} There were noted issues with the supervised visitations. The children were "noted to be disruptive, aggressive at times, and not well-controlled by the adults. [P.S.] was also given food he was not to be eating. . . . At times the adults did not bring food or drinks for the children." (*Id.*) In addition, according to the foster parents, the children exhibited poor behavior after the visitations that they did not regularly exhibit.

{¶14} On October 6, 2023, JFS filed for permanent custody of the children. In May of 2024, a motion was filed to return the children to the Legal Custodian, Rebecca.

{¶15} A final hearing was held on the pending motions on May 31, 2024. Testimony at the hearing indicated that the children were thriving in their placements and getting their necessary medical treatment. Meanwhile, appellants were largely compliant with "completing" the case plan goals and visiting the children, but testimony indicated that appellants were not demonstrating any parenting skills from their classes.

{¶16} The testimony did indicate that the appellants had obtained housing at the time of the final hearing. There was testimony that appellants were living in a

---

[4] The report also noted numerous "substantiated" findings of neglect against Rebecca in the past.

home provided in some manner by Father's employer at the junkyard. Mother and Father were supposed to be moving into their own apartment across the street when it was ready, but there was no indication as to when that would be. Further, there was no lease information provided.

{¶17} The children's GAL and Father's GAL both recommended that JFS's permanent custody motion be granted.[5] At the conclusion of the hearing the trial court took the matter under advisement.

{¶18} On January 28, 2025, the trial court filed a final judgment entry granting JFS permanent custody of the children.[6] All appellants individually filed appeals. Father asserts the following assignments of error for our review:

**Father's First Assignment of Error**

**The Juvenile Court's decision is against the manifest weight of the evidence as the agency did not prove by clear and convincing evidence that the agency should be granted permanent custody of the minor children.**

**Father's Second Assignment of Error**

**The Juvenile Court committed prejudicial error in finding that the agency made reasonable efforts and diligent case planning to accommodate the parents' alleged disabilities to reunite them with their children.**

---

[5] The parties all stipulated that Mother's GAL had submitted a report and it was reviewed by the parties. The record contains an "initial report," shortly after Mother's GAL was appointed. It appears Mother's GAL's final report was not included in the record, though Mother's GAL was present at the final hearing and indicated her final recommendation was still consistent with her "report."

[6] A *nunc pro tunc* entry was filed January 30, 2025.

**Father's Third Assignment of Error**

**The Juvenile Court's finding that the permanent custody motion was filed following the requisite twelve (12) month period was in error and a violation of the Due Process rights of the appellants.**

**Father's Fourth Assignment of Error**

**The Juvenile Court's approval of a third six-month time extension and the subsequent permanent custody decision(s) were violations of the Due Process rights of the appellants.**

Mother asserts the following assignment of error for our review:

**Mother's Assignment of Error**

**The agency failed to put forth reasonable efforts for reunification of the parents with the children despite the compliance of the parents with the case plan in [sic] the agency's plan seemed to exclude them and to seek permanent custody of the children was error under such circumstances.**

Rebecca asserts the following assignments of error for our review:

**Rebecca's First Assignment of Error**

**The trial court erred when it overruled appellant's motion for custody and granted appellee's motion for permanent custody. The decision is against the manifest weight of the evidence that the minor children could not be returned to appellant as the legal custodian in a reasonable amount of time.**

**Rebecca's Second Assignment of Error**

**The trial court erred when it determined that the only way to establish permanency for the minor children was to grant permanent custody to the agency ignoring the mandate that when a kinship placement is identified and available for legal custody that is the resolution that is in the best interest of the minor children.**

{¶19} Where the assignments of error overlap, we will address them together. We will also address some assignments of error out of the order in which they were raised.

*Father's First Assignment of Error*; *Rebecca's First Assignment of Error*

{¶20} Father and Rebecca both argue that the trial court's decision to grant permanent custody to JFS was against the manifest weight of the evidence. In addition, Rebecca argues that in granting JFS's permanent custody motions, the trial court erred by denying her motion for legal custody.

Standard of Review

{¶21} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th Dist.). The Supreme Court of Ohio clarified the manifest-review standard in parental rights cases in *In re Z.C.*, 2023-Ohio-4703, holding that when reviewing a court's

award of permanent custody and termination of parental rights, "the proper appellate standards of review to apply . . . are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *Id.* at ¶ 18. Father's first assignment of error, and Rebecca's first assignment of error, challenge the termination of their rights under a manifest-weight standard.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

Analysis

{¶22} Revised Code 2151.414 sets forth specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child. *In re C.F.*, 2007-Ohio-1104, ¶ 22. Specifically, there are two separate elements that must be established by clear and convincing evidence: (1) one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) must apply; and (2) granting permanent custody to an agency must be in the child's best interest. R.C. 2151.414(B)(1). Father and Rebecca argue that the trial court's determinations regarding both permeant custody elements were against the weight of the evidence. We will review each issue in turn.

**{¶23}** First, Father and Rebecca argue that the trial court erred by determining that R.C. 2151.414(B)(1)(a) applied to this case. This statutory provision reads as follows:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**{¶24}** In determining whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents pursuant to R.C. 2151.414(B)(1)(a), the trial court is directed to consider the factors contained in R.C. 2151.414(E) alongside "all relevant evidence." The trial court listed all factors in R.C. 2151.414(E) in its judgment entry, finding that factors (E)(1) and (E)(2) supported granting permanent custody, whereas the remaining

Case Nos. 6-25-03, 04

factors did not apply to all appellants. Revised Code 2151.414(E)(1) and (2) read as follows:

> (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

**{¶25}** In its final entry, the trial court conducted a lengthy analysis of factors (E)(1) and (E)(2). With regard to factor (E)(1), the trial court noted the *significant*

-12-

medical issues with the children that were largely ignored or neglected by appellants. Many of the children's health issues had *vastly* improved in their placements.

{¶26} By contrast, the appellants, despite completing classes under the case plan, were noted to be unable to demonstrate actual behavioral changes. For example, appellants wanted to home-school the children if returned but they could not produce any type of educational plan. Moreover, although the appellants had secured some type of housing, it was unclear how permanent the housing would be. Further, there was a hole in the roof of the house that they had secured that they were waiting to be repaired.

{¶27} Testimony in the record also demonstrated that the appellants were not taking the time to understand the special needs of the children. Although it is questionable according to the forensic psychologist whether Mother and Father have the capacity at all to understand the children's needs, none of the appellants demonstrated continued efforts toward learning the children's medical needs. This was particularly troubling given the state of the children at the inception of this case.

{¶28} The trial court determined that JFS had engaged in reasonable efforts to support reunification and correct the reasons the children were removed, but the appellants had failed to continuously and repeatedly remedy the issues. Given the testimony and evidence submitted in the record, the trial court's finding on this factor is supported.

{¶29} Finding that factor (E)(1) was present is enough by itself to proceed to the next step of the analysis, but the trial court also determined that factor (E)(2) applied. In its analysis of (E)(2), the trial court noted the mental evaluations of the appellants, which indicated that none "of the adults could be effective parents to the[] children." Although there was some testimony that Rebecca could, under the right circumstances, be able to care for the children, Rebecca had already been derelict in that duty and was showing no improvement according to the caseworkers. Rebecca was also improperly using Mother's disability payments to support the entire family. It is unclear why Rebecca did not work, though there was some discussion that she had applied for disability and did not receive it.

{¶30} Furthermore, for a significant portion of this case the appellants were homeless. Although it is laudable that they had obtained a residence at the time of the final hearing, it is questionable, at best, how stable that home would be in the long-term. Given the testimony and evidence presented, we do not find that the trial court's determinations regarding R.C. 2151.414(E)(1) and (E)(2) were against the manifest weight of the evidence. Because one or more of the factors in R.C. 2151.414(E) were present in this case, the trial court determined that the children cannot be placed with the appellants within a reasonable time and should not be placed within a reasonable time pursuant to R.C. 2151.414(B)(1)(a).

**{¶31}** With the first prong of the permanent custody analysis established, the trial court was required to proceed to the second prong—the best interests analysis under R.C. 2151.414(D)(1). This statutory subsection reads as follows:

(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶32} In its entry, the trial court again individually addressed each of the statutory factors. We will review each factor in-turn.

{¶33} With regard to factor (a), the trial court noted that the children were bonded to their foster families and that the children suffered behavioral setbacks after visitations with the appellants. Moreover, the appellants never progressed beyond supervised visitation due, in part, to a lack of safe and stable housing during the pendency of the case.

{¶34} With regard to factor (b), the trial court indicated that the children were too young to express their wishes; however, we note that the children's GAL recommended that JFS be granted permanent custody. In fact, the GAL for the children specifically noted that Rebecca denied medical neglect of the children despite their deplorable health issues upon removal by JFS. Father's GAL also recommended that permanent custody be granted to JFS.

{¶35} With regard to factor (c), the trial court determined that the children had been outside of their home since December of 2022. In addition, the children had a prior JFS case that concluded early in the year that this case was opened. The children's medical needs were not being met by appellants, and there is no indication that appellants were preparing to change that in the future.

{¶36} With regard to factor (d), the trial court indicated the children were in need of a legally secure placement, which they could receive through a grant of permanent custody to JFS. Although Rebecca argues that they could have a legally

secure placement with her, by all accounts Rebecca had not demonstrated changes from working the case plan.

**{¶37}** The trial court found that factor (e) was not applicable.

**{¶38}** After reviewing the factors, we find that this is not one of the "exceptional" cases where the evidence weighs heavily against the trial court's decision such that we may overturn the decision under a manifest weight standard. For the same reasons stated herein, we do not find that the trial court erred by denying Rebecca's motion for legal custody. The trial court thoroughly analyzed the appropriate portions of the relevant statutes and the trial court's analysis is supported by the record. Therefore, Father's first assignment of error and Rebecca's first assignment of error are overruled.

*Father's Second Assignment of Error; Mother's Assignment of Error*

**{¶39}** Father and Mother argue that JFS failed to make reasonable efforts in this case to support reunification.

Relevant Authority

**{¶40}** "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.*, 2007-Ohio-1104, ¶ 29. Revised Code 2151.419(A)(1) requires a trial a trial court to determine whether a children's services agency "made reasonable efforts to prevent the removal of the child from the child's home, to

eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children[.]" *In re C.F.* at ¶ 41; *accord In re R.R.*, 2021-Ohio-1620, ¶ 78 (3d Dist.).

{¶41} Notably, the Supreme Court of Ohio concluded that "'[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *In re C.F.* at ¶ 41, quoting *In re A.C.*, 2004-Ohio-5531, ¶ 30 (12th Dist.). Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody. *Id.* at ¶ 42. "[If] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶42} In *In re R.R.*, 2021-Ohio-1620, ¶ 79 (3d Dist.), this Court applied the Supreme Court of Ohio's holding in *In re C.F.* and determined that because the trial court previously made reasonable-efforts findings, an agency was not required to prove, nor was the trial court required to find, that the agency used reasonable efforts to reunify parents with their children before the trial court could grant permanent custody to the agency.

Analysis

**{¶43}** Although Father and Rebecca argue that the trial court erred by determining in its final judgment entries that JFS engaged in reasonable efforts to support reunification, the trial court had previously determined that JFS engaged in reasonable efforts to reunify the family at multiple earlier points in this case. In fact, a finding of reasonable efforts was conceded by appellants during prior hearings, though not at every hearing.

**{¶44}** Generally, a children's services agency is required to demonstrate reasonable efforts prior to filing a permanent custody motion, not at the permanent custody hearing, *unless it has failed to do so previously. In re I.C.*, 2023-Ohio-4707, ¶ 58 (3d Dist.), citing *In re S.S.*, 2017-Ohio-2938, ¶ 166-169 (4th Dist.). "Because the trial court entered a reasonable efforts finding before placing the children in the agency's permanent custody," it was not required to do so again. *See id.*

**{¶45}** At one hearing, the appellants did contest the issue of reasonable efforts, despite conceding it in prior hearings, and the trial court held a hearing specifically on the issue. Testimony was presented regarding the services offered to the appellants and their engagement with the case plan.

**{¶46}** By all accounts, the appellants *did* engage to a strong degree with the case plan. However, despite the efforts of JFS, the appellants demonstrated a similar lack of follow-through with timely obtaining housing or making behavioral changes. Some of the lack of follow-through is almost undoubtedly due to diminished

capacity, but JFS could not make behavioral changes for the appellants. Despite "completing" many case goals, appellants had to demonstrate changes and they were unable to do so.

{¶47} As we have stated repeatedly previously, the issue is not whether there was more that JFS could have done, but rather whether the case plan and efforts to support reunification were reasonable under the circumstances. *In re L.F.*, 2025-Ohio3026, ¶ 53. We do not find in this case that Father and Mother established on appeal that JFS failed to engage in reasonable efforts to support reunification. Therefore, Father's second assignment of error is overruled and Mother's assignment of error is overruled.

*Father's Third Assignment of Error*

{¶48} In Father's third assignment of error, he argues that the trial court erred by "finding that the permanent custody motion was filed following the requisite twelve (12) month period." More specifically, he contends that for a trial court to make a finding under to R.C. 2151.414(B)(1)(d), a child must be in the temporary custody of an agency for twelve or more months of a consecutive twenty-two month period; however, the trial court did not enter a finding under R.C. 2151.414(B)(1)(d). Rather, in the first prong of the permanent custody analysis, the trial court proceeded under R.C. 2151.414(B)(1)(a), which reads:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court

determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

This statutory subsection specifically permits granting permanent custody to JFS when a child has not been with an agency for twelve or more months of a consecutive twenty-two month period, defeating Father's argument. Therefore, his third assignment of error is overruled.[7]

*Rebecca's Second Assignment of Error*

{¶49} In her second assignment of error, Rebecca argues that the trial court erred by not properly considering kinship placement.

---

[7] JFS also notes that there was a prior children's services case with these children that could be used to satisfy the calculation in any event.

Relevant Authority

{¶50} Revised Code 2151.4115 through 2151.4122 (the "Kinship Caregiver Act") became effective on September 30, 2021. The Act requires a public children services agency, such as JFS, to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in [the] [t]emporary custody of the agency." R.C. 2151.4116(A). A "kinship caregiver" includes individuals related to the child by blood or adoption, such as grandparents or siblings, as well as stepparents and stepsiblings, legal custodians or guardians, and "[a]ny nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties." R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85 for application to R.C. 2151.4116 through 2151.4122).

{¶51} Once a child is in an agency's temporary custody, the juvenile court must determine at every hearing regarding the child whether the agency has satisfied its duty to use intensive efforts to identify and engage an appropriate and willing kinship caregiver. R.C. 2151.4117.

Analysis

{¶52} Rebecca argues that "it appeared at the permanent custody hearing" that there were three known eligible kinship caregivers in this case. She argues that

JFS did not comply with its duties under the Kinship Caregiver Act to investigate placements with these individuals.

{¶53} One of the kinship caregivers Rebecca lists is herself, and we have already determined that the trial court did not err with regard to granting JFS's motion for permanent custody and thus denying her motion for legal custody.

{¶54} The other two people Rebecca lists are Diana R., who was *already* P.S.'s caretaker, and Tamara Mansfield, who was *already* N.S.'s caretaker. It is disingenuous to suggest JFS did not actively engage and investigate appropriate placements with these people when the children were placed with the very people Rebecca is suggesting. This is particularly true given that both Diana and Tamara expressed interest in keeping the children and fostering a relationship between them. Furthermore, neither Diana nor Tamara specifically sought legal custody and we have no indication in the record that legal custody was an option they were willing to accept.

{¶55} Given the actual evidence in the record, we can find no error here, let alone prejudicial error. Therefore, Rebecca's second assignment of error is overruled.

*Father's Fourth Assignment of Error*

{¶56} In Father's fourth assignment of error, he argues that the trial court erred by granting an extension of temporary custody "outside of the statutory two-

year period required for conclusion of the matter." Father contends that the trial court's final judgment entry, filed in January of 2025, approximately eight months after the conclusion of the final hearing was past the "sunset date," thus violating his Due Process rights.

{¶57} Revised Code 2151.353(G) provides that a trial court shall not order an existing temporary custody order to extend beyond the two-year "sunset date." The "sunset date" is the date upon which temporary custody is terminated when there is no motion filed pursuant to R.C. 2151.415(A). However, *In re Young*, indicates that "[t]he passing of the statutory time period ('sunset date') pursuant to R.C. 2151.353(F) does not divest juvenile courts of jurisdiction to enter dispositional orders." *In re Young Children*, 76 Ohio St.3d 632 (1996), at syllabus.

{¶58} In this case, JFS timely filed a permanent custody motion and there is no claim that the motion was not heard within the proper statutory timeframe. While the trial court issued its final judgment beyond what would have been the "sunset date," the issue was pending for decision before the sunset date and there is nothing in the record to suggest that the trial court issued an improper "extension of time." In similar circumstances, we have rejected arguments that sought to invalidate a final judgment rendered after the "sunset date." *In re H.M.*, 2019-Ohio-3721, ¶ 98-101 (3d Dist.). Because the trial court retained jurisdiction to issue its final dispositional order, we can find no error here and no violation of Due Process. Therefore, Father's fourth assignment of error is overruled.

*Conclusion*

**{¶59}** Having found no error prejudicial to appellants in the particulars assigned and argued, their assignments of error are all overruled, and the judgments of the Hardin County Common Pleas Court, Domestic Relations Division, Juvenile Section, are affirmed.

***Judgments Affirmed***

**MILLER and WILLAMOWSKI, J.J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgments of the trial court are affirmed with costs assessed to Appellants for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.


_____
Juergen A. Waldick, Judge


_____
Mark C. Miller, Judge


_____
John R. Willamowski, Judge

DATED:
/jlm